1  David H. Weinstein (SBN 43167)
   WEINSTEIN KITCHENOFF & ASHER
2  1845 Walnut Street, Suite 1100
   Philadelphia, Pennsylvania 19146
3  Telephone: (215) 545-7200
   Facsimile: (215) 545-6535
4  Email: weinstein@wka-law.com

5  Attorneys for Plaintiff

6  [Additional counsel listed on signature page]

7

8
                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA

10
                                          )  CIVIL ACTION NO.: _____
11 BRYON BISHOP, Individually and On Behalf )
   of All Others Similarly Situated,       )  CV 09 4128
12                                          )
                        Plaintiff,          )  COMPLAINT – CLASS ACTION
13            v.                            )
                                            )
14 ELECTRONIC ARTS, INC., NATIONAL          )  DEMAND FOR JURY TRIAL
   COLLEGIATE ATHLETIC ASSOCIATION,         )
15 and COLLEGIATE LICENSING COMPANY,        )
                                            )
16                      Defendants.         )
                                            )
17                                          )
                                            )
18                                          )

19

20      Plaintiff Bryon Bishop, by and through his attorneys, alleges as follows:

21                          **I. Introduction**

22      1.      This suit stems from the unlawful misappropriation by Electronic Arts of National

23 Collegiate Athletic Association ("NCAA") student-athlete likenesses. In the interest of generating

24 increased sales of its NCAA football and basketball video games, Electronic Arts has disregarded

25 the NCAA prohibition on use of its players' likenesses and names. In fact, Electronic Arts has

26 made great efforts to ensure that it *does* use players' likenesses to enhance the reality of its

27 software, and actively facilitates the addition of student-athlete names to the company's games at

28

CLASS ACTION COMPLAINT

1  the click of a button. The NCAA and its licensing arm, the Collegiate Licensing Company

2  ("CLC"), are complicit in this conduct in that they have ignored the NCAA's bylaws and instead

3  sanctioned Electronic Arts's violations. The NCAA and the CLC have even investigated and

4  approved Electronic Arts's use of student-athlete likenesses and names. The NCAA and CLC

5

6  benefit from Electronic Arts's use of likenesses and names through the greater royalties paid to

7  them as a result of increased game sales.

8      2.    This is a proposed class action on behalf of NCAA student-athletes whose

9  likenesses have been used by Defendants without consent in violation of state law, in order to

10  increase revenues and profits for the Defendants.

11                          **II.    PARTIES**

12     3.    Plaintiff Bryon Bishop is a South Carolina resident and the former starting left

13

14  guard for the University of North Carolina football team.

15     4.    Defendant Electronic Arts, Inc., a Delaware corporation, is an interactive

16  entertainment software company that produces the NCAA Football, NCAA Basketball, and

17  NCAA March Madness video game franchises. Electronic Arts describes itself as the "world's

18  leading independent publisher and developer of video games" for numerous platforms, and in FY

19  2008 the company recorded net revenues of $3.67 billion. Electronic Arts's principal place of

20  business is Redwood City, California.

21

22     5.    Defendant NCAA is an unincorporated voluntary association that governs United

23  States college athletics. Through its expansive licensing operation, the NCAA generates hundreds

24  of millions in royalties, broadcast rights, and other fees each year. The NCAA recorded fiscal

25  year 2007-08 revenues of $614 million. Almost 90% of the NCAA's annual budget revenues stem

26  from marketing and television rights. NCAA is headquartered in Indianapolis, Indiana.

27

28

CLASS ACTION COMPLAINT                                     2

6.     The Collegiate Licensing Company, a Georgia corporation headquartered in

Atlanta. Georgia, is the nation's leading collegiate trademark. licensing, and marketing company.

The CLC represents the NCAA, along with nearly 200 colleges and universities, bowl games, and

athletic conferences. CLC is a subsidiary of IMG, the self-proclaimed "world's premier and most

diversified sports. entertainment and media company."

## III.     JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff

is a citizen of a different state than the Defendants.

8.     This Court has personal jurisdiction over the Defendants because Defendant

Electronic Arts is headquartered in the District and Defendants CLC and NCAA conduct

substantial business in the District. Furthermore, many of the actions giving rise to the complaint

took place in the District.

9.     Venue is proper in this District under 28 U.S.C. § 1391 because at all times

relevant hereto Defendants resided, transacted business, were found, or had agents in this district

and because a substantial portion of the actions giving rise to the claims were carried out in this

district.

10.     Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

the Court is appropriate because Defendant's headquarters and principal place of business is in

Redwood City, California. Because this action arises in the county of San Mateo, pursuant to

Northern District of California, Local Rule 3-2(d), assignment to either the San Francisco Division

or the Oakland Division is proper.

## IV.  DEFENDANTS' UNLAWFUL CONDUCT

11.     Electronic Arts produces the NCAA Football, NCAA Basketball, and NCAA March Madness video game franchises. Video game titles within these franchises simulate basketball and football games between NCAA member schools. Consumers demand that Electronic Arts simulate college sports contests in the most realistic manner possible, just as Electronic Arts simulates professional sports games with remarkable detail. A critical element of this simulation is the replication of player likenesses.

12.     In June 2004, CLC President Pat Battle appeared before the NCAA Subcommittee on Agents and Amateurism to advocate for reduced restrictions on video game licensing. Battle told the subcommittee: "A failure to keep up with technology and take full advantage from a consumer standpoint may make the NCAA [video game] title less valuable." In that vein, Electronic Arts spends millions of dollars each year to ensure the realism of its video games, and advertises this realism in the promotion of its products. Specifically, pursuant to a licensing agreement with CLC, Electronic Arts replicates team logos, uniforms, mascots, and even member school stadiums with almost photographic realism.

13.     As discussed below, Electronic Arts is not permitted to use player likenesses and names. In reality, however, Electronic Arts – with the knowledge, participation, and approval of the NCAA and CLC – extensively utilizes actual player likenesses and names. The three entities are well aware that the heightened realism in NCAA video games translates directly into increased sales of those games, and therefore increased revenues for Electronic Arts and increased royalties for CLC and NCAA.

### A.      Prohibitions on Use of Likeness or Names

14.     NCAA Division I bylaws prohibit companies from profiting off of the use of NCAA student-athlete likenesses or names.

CLASS ACTION COMPLAINT                                    4

15. Pursuant to Bylaw 12.5, "commercial items with names, likenesses or pictures of multiple student athletes" may be sold only at NCAA member institutions or their outlets. Furthermore, "[i]tems that include an individual student-athlete's name, picture or likeness . . . may not be sold[.]"

16. Before being allowed to compete each year, all Division I NCAA athletes sign Form 08-3a, a contract agreeing that they have "read and understand" the NCAA's rules on prohibitions on the commercial use of their name, picture, or likeness and affirming that "to the best of [their] knowledge [they] have not violated any amateurism rules."

17. The NCAA has a duty to NCAA student-athletes to honor its own standards that prohibit the for-profit commercial use of amateur student-athlete likenesses. CLC is likewise obligated to honor NCAA prohibitions on the use of student likenesses. Upon information and belief, the licensing agreement between CLC and Electronic Arts prohibits use of student-athlete names and likenesses in video games. Moreover, the NCAA, through its licensing arm, must approve every Electronic Arts video game produced pursuant to the NCAA licensing agreement.

**B. Electronic Arts's Misappropriation of Player Likenesses and Names**

18. Electronic Arts purports to honor the NCAA's regulations nominally prohibiting the use of player likenesses and names. However, the company's conduct makes clear that it pays lip service to NCAA regulations while blatantly incorporating player likenesses and names in the interest of selling video games. As an Electronic Arts spokesperson explained in an August 2005 interview with *The Indianapolis Star*, the company's approach to the use of player likenesses and names is: "Ok, how far can we go?"

19. In each of the NCAA sports games, Electronic Arts seeks to precisely replicate each school's entire team. With rare exception, virtually every real-life Division I football or basketball player in the NCAA has a corresponding player in Electronic Arts's games with the

same jersey number, and virtually identical height, weight, build, and home state. In addition,

Electronic Arts matches the player's skin tone, hair color, and sometimes hair style.

**i.     Misappropriation of Plaintiff's Likeness**

20.     Plaintiff Bryon Bishop had his name and likeness replicated in several games.

21.     Plaintiff enrolled at the University of North Carolina in 2004. He did not play in his freshman season, instead taking a "redshirt" year and preserving four years of NCAA eligibility. He did not play in 2005 due to a back injury, and saw action in five football games as a sophomore in 2006.

22.     In 2007, Plaintiff's junior year, he played in two football games at left guard, and in 2008, as a redshirt senior, Plaintiff started in four games at left guard and played in nine games.

23.     Plaintiff wore North Carolina jersey number 76. The player who wears number 76 for North Carolina in NCAA Football 2008 and NCAA Football 2009 has the same height, weight, skin tone, hair color, hair style and home state as Bryon Bishop. North Carolina player "No. 76" is also the starting left guard for the Tar Heels in NCAA Football 2009, and his school year corresponds with Bishop's school year.

**ii.     Misappropriation of Other Student-Athlete Likenesses**

24.     The misappropriation of Plaintiff's likeness is part of Defendants' practice of misappropriating the likeness of nearly every NCAA Division I football and basketball player.

25.     For example, Florida Gators Heisman Trophy-winning quarterback Tim Tebow wears number 15, stands 6'3" tall, weighs between 230 and 240 pounds, and is left-handed. Tebow, who hails from Florida, is Caucasian and plays with a band on his right wrist and forearm.

26.     In the Electronic Arts NCAA Football 2009 game, which simulates the NCAA football season that began in September 2008, Florida's starting quarterback wears number 15, stands 6'3" tall, weighs 232 pounds, throws left-handed, is Caucasian, wears a band over his right

forearm, and hails from Florida. This depiction of Tim Tebow cannot be explained as mere coincidence.

27. Electronic Arts's blatant misappropriation of player likenesses is highlighted by a comparison of Electronic Arts's NCAA titles to its professional football and basketball titles – for which Electronic Arts has the legal right to player likenesses through license agreements.

28. One would expect significant changes to virtual players' likenesses when those players graduate from an Electronic Arts NCAA sports title, where use of a player's likeness is prohibited, to a professional sports video game for which Electronic Arts has licensed that player's likeness. Yet, the virtual likenesses of newly professional athletes remain practically identical to the likenesses of those athletes utilized by Electronic Arts for its recent NCAA video games.

29. Misappropriation of NCAA basketball players' likenesses is equally egregious. For example, in 2007 Duke point guard Greg Paulus was 6'1" tall and weighed 185 pounds. Paulus, a junior from New York, is Caucasian and played with a wristband on his left wrist.

30. The Electronic Arts NCAA March Madness 2008 game depicts the Duke point guard "No. 3" as a Caucasian from New York with measurements identical to those of Mr. Paulus and also sporting a left wristband.

31. North Carolina center Tyler Hansbrough, number 50 for the Tar Heels, hails from Missouri and was a 6'9"-tall, 245-pound junior in 2007. The March Madness 2008 game depicts the North Carolina center, "No. 50," with the same home state and physical characteristics.

32. In addition to physical features, Electronic Arts even matches players' unique equipment preferences, including wristbands, headbands, and visors.

33. For example, Virginia Tech cornerback "No. 1" wears a visor in the NCAA Football 2009 game, just like Victor "Macho" Harris, the actual Virginia Tech cornerback who

wore number 1. Harris. a senior in 2008, stood 6'0" and weighed 192 pounds – identical to his EA Sports doppelganger.

34. Similarly, University of Texas quarterback "No. 12" wears a right elbow sweatband and wristbands on both wrists. The real Texas number 12, starting redshirt junior quarterback Colt McCoy, also wore a pair of wristbands and a right elbow sweatband, and measured 6'3" and 210 for the 2008 season – again identical to his video game replication.

35. These are not unique examples. Defendants deliberately and systematically misappropriate players' likenesses to increase revenues and royalties.

36. Where players have unique and identifiable playing behaviors, Electronic Arts attempts to match those as well.

37. Electronic Arts also matches the virtual player's home state to the player's actual home state, and in its football series often lists a city close to the player's real hometown as the virtual player's hometown.

38. The only detail that Electronic Arts omits in its initial sale of the software is the real-life player's name on the jersey of his electronic equivalent. As one commentator observed, "the omission of players' names seems little more than a formality. done with a wink and a nudge."

39. In fact, the initial omission of players' names is of little consequence because Electronic Arts has facilitated the simple upload of actual player names for all virtual players through its design of the games and related technology.

40. In the most recent versions of its games for the Sony PlayStation 3 and Microsoft Xbox 360, gamers can share rosters online using the company's proprietary "EA Locker" feature. The EA Locker feature allows gamers to upload rosters from other gamers while logged into the Electronic Arts game itself. Once rosters are uploaded, the default jerseys in the game that contain

only player numbers are replaced with jerseys that contain both the player's actual name and number. Furthermore, in-game announcers then refer to players by their real names.

41.     Alternatively, gamers have long been able to download rosters from a computer, upload the files to the gaming console, and then transfer the rosters to the appropriate video game. Numerous companies release data files that contain the complete rosters for each NCAA Division I school. These rosters can be placed on flash drive or memory card, and then easily uploaded.

42.     Electronic Arts could easily block users from uploading actual player names, as it does with names that contain profanities.

43.     In addition to designing technology that ensures player names can be incorporated in a matter of seconds, Electronic Arts uses its website to promote the concept that virtual NCAA likenesses are, in fact, copies of the real players that wear the identical numbers. Through the Electronic Arts website, the company allows gamers to post video clips from the video games, and the clips are often labeled with actual player names even though they feature only Electronic Arts's computer generated simulations.

## V.     INJURY TO CLASS MEMBERS AND PLAINTIFF

44.     Player names and likenesses and publicity rights are extremely valuable, intangible property. For example, it has been publicly reported that Electronic Arts pays the NFL Players Union nearly thirty-five million dollars each year for the use of players' names and likenesses.

45.     In clear violation of the NCAA's own rules, and despite contractual provisions prohibiting the use of player names and likenesses, the NCAA, CLC, and Electronic Arts have conspired to enable the use of player names and likenesses in Electronic Arts's video games for Defendants' own monetary gain and without any compensation to the individual athletes. In furtherance of the conspiracy, Electronic Arts produced these games by improperly using player likenesses with the knowledge and consent of the CLC and the NCAA. Specifically, despite their

affirmative duties to prevent the use of player names and likenesses, and in furtherance of the conspiracy. the CLC and the NCAA have intentionally ignored Electronic Arts's blatant use of NCAA athlete names and likenesses and, in fact, have explicitly approved the utilization of NCAA athlete names and likenesses.

## VI.   COMMON COURSE OF CONDUCT EMANATING FROM CALIFORNIA AND INDIANA

46.    Electronic Arts is headquartered in Redwood City, California and is therefore a California resident and citizen. As a California resident and citizen, Electronic Arts is subject to California laws. Moreover, the executives responsible for negotiating the licensing agreements for NCAA games reside and work in California. Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC have required frequent contact with Indiana by Electronic Arts, including but not limited to meetings at the NCAA's headquarters in Indiana.

47.    The NCAA has its principal place of business in Indiana and is therefore an Indiana resident and citizen. As an Indiana resident and citizen, the NCAA is subject to Indiana laws. The primary executives responsible for negotiating the licensing agreements for the NCAA games produced by Electronic Arts reside and work in Indiana. Approval to unlawfully utilize player likenesses was granted by NCAA executives located in Indiana. Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC has required frequent contact with California, including but not limited to meetings at Electronic Arts's headquarters in California regarding player likenesses and frequent reaching out to individuals in the state via interstate wires and the internet.

48.    CLC has its principal headquarters in Atlanta, Georgia. Upon information and belief, its contracts with the NCAA were negotiated in Indiana, and the administration of the contracts required frequent contact and travel to Indiana. CLC's contracts with Electronic Arts

CLASS ACTION COMPLAINT                                                                                                    10

were negotiated, in whole or in part, with executives located in California. The administration of the contracts, including the provisions regarding player likenesses, requires frequent contact with California. In negotiating and executing the player likeness provisions of the license with Electronic Arts, CLC was directed by the NCAA and executives of the NCAA in Indiana.

49.    Defendants' unlawful conspiracy took place in California and Indiana. Specifically, the unlawful course of conduct was directed and ratified by Defendants in both California and Indiana.

## VII.    CLASS ACTION ALLEGATIONS

50.    Plaintiff sues on his own behalf and on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23. The putative Class is defined as:

> All NCAA football and basketball players listed on the official opening day roster of a school whose team was included in any interactive software produced by Electronic Arts, and whose assigned jersey number appears on a virtual player in the software.

51.    Excluded from the class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial officers, and associated court staff assigned to this case.

52.    The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each class member can be identified by using the Defendants' records. Plaintiff is informed and believes that there are many thousands of Class members.

53.    There are common questions of law and fact specific to the Class that predominate over any questions affecting individual class members, including:

(a)    Whether Electronic Arts utilizes NCAA player likenesses in its video games;

CLASS ACTION COMPLAINT                                                                                      11

| | (b) | Whether such use is unlawful; |
|---|---|---|
| | (c) | Whether the NCAA's duty of good faith and fair dealing requires it to protect players' likeness rights when dealing with Electronic Arts; |
| | (d) | Whether the NCAA and the CLC have conspired with Electronic Arts to illegally use players' likenesses; |
| | (e) | Whether Defendants have authorized, approved, or permitted Electronic Arts's use of NCAA player likenesses in its video games; |
| | (f) | Whether NCAA's conduct violates Indiana Code § 32-36-1-1; |
| | (g) | Whether Electronic Arts's conduct violates California Civil Code § 3344; |
| | (h) | Whether Electronic Arts's conduct violates California common law rights of publicity; |
| | (i) | Whether Electronic Arts's conduct constitutes an unfair trade practice; |
| | (j) | Whether class members have been damaged by Defendants' conduct and the amount of such damages; |
| | (k) | Whether punitive damages are appropriate and the amount of such damages; |
| | (l) | Whether statutory damages are appropriate and the amount of such damages; and |
| | (m) | Whether Defendants should disgorge their unlawful profits and the amount of such profits. |

54.     Plaintiff's claims are typical of the Class's claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

55.     Plaintiff will fairly and adequately protect the interests of the Class. He will vigorously pursue the claims and has no antagonistic conflicts. Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the video game industry.

56.     Defendants have acted or refused to act on grounds that apply generally to the Class and final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. A class action is also appropriate because Defendants have acted and refused to take

1  steps that arc, upon information and belief, generally applicable to thousands of individuals,

2  thereby making injunctive relief appropriate with respect to the Class as a whole.

3       57.     Questions of law or fact common to class members predominate over any questions

4  affecting only individual members. Resolution of this action on a class-wide basis is superior to

5

6  other available methods and is a fair and efficient adjudication of the controversy because in the

7  context of this litigation, no individual class member can justify the commitment of the large

8  financial resources to vigorously prosecute a lawsuit against Defendants. Separate actions by

9  individual class members would also create a risk of inconsistent or varying judgments, which

10 could establish incompatible standards of conduct for Defendant and substantially impede or

11 impair the ability of class members to pursue their claims. It is not anticipated that there would be

12 difficulties in managing this case as a class action.

13

14                    **VIII.   CAUSES OF ACTION**

15                    **FIRST CAUSE OF ACTION**
           **(Deprivation on Rights of Publicity, Violation of Indiana Code § 32-36-1-1)**
16                          **(As Against NCAA)**

17      58.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

18 set forth herein.

19      59.     Plaintiff's and class members' names, voices, signatures, photographs, images,

20 likenesses, distinctive appearances, gestures, and mannerisms have commercial value. Pursuant to

21 and in furtherance of its unlawful conspiracy with the NCAA and the CLC, Electronic Arts has

22
   used and continues to use Plaintiff's and class members' names, images, likenesses, and
23
   distinctive appearances without their consent in connection with and for the purposes of
24
25 advertising, selling, and soliciting purchases of its video games, including its NCAA Football,

26 NCAA Basketball, and NCAA March Madness franchises.

27

28

CLASS ACTION COMPLAINT                                                                    13

60. Defendants have willfully and intentionally used and continued to use Plaintiff's and class members' rights of publicity.

61. Defendants undertook actions in furtherance of their conspiracy within the State of Indiana. Specifically, Defendant NCAA is located in Indiana and all conduct of the NCAA alleged herein took place or was ratified in Indiana. In addition, NCAA has hosted meetings in Indiana, contracted in Indiana, and NCAA's decisions and approvals for the use of player names and likenesses arose in and emanated from Indiana.

62. As a result of NCAA's conduct, Plaintiff has been injured.

## SECOND CAUSE OF ACTION
### (Deprivation of Rights of Publicity
### Violation of California Civil Code § 3344)
### (As Against Electronic Arts)

63. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

64. Electronic Arts has knowingly and intentionally utilized and continues to utilize the names and likenesses of Plaintiff and class members in video games produced by Electronic Arts without the consent of Plaintiff and class members. This conduct has occurred in and emanated from California, specifically Electronic Arts's headquarters.

65. Electronic Arts has used and continues to use Plaintiff's and class members' names and likenesses for the purposes of advertising, selling, and soliciting purchases of Electronic Arts's video games, including its NCAA Football, NCAA Basketball, and NCAA March Madness franchises. Most decisions and policy relating to this conduct have occurred in and emanated from California, specifically Electronic Arts's headquarters.

66. As a result of Electronic Arts's misappropriation of their publicity rights, Plaintiff and class members have been injured.

1

**THIRD CAUSE OF ACTION**
**(Violation of Rights of Publicity**
**California Common Law)**
**(As Against Electronic Arts)**

2

3

4

67.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

set forth herein.

5

68.    Pursuant to their unlawful conspiracy, Electronic Arts has utilized and continues to

6

7

utilize without their consent the names, likenesses, and identities of Plaintiff and class members in

8

Electronic Arts's video games for its own commercial advantage.

9

69.    As a result of Electronic Arts's misappropriation of their publicity rights, Plaintiff

10

and class members have been injured.

11

12

**FOURTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(As Against All Defendants)**

13

14

70.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

15

set forth herein.

16

71.    On information and belief, Defendants, and each of them, have conspired and

17

combined with each other, and possibly with third parties, to use class members' likenesses

18

19

without permission, and have achieved a meeting of the minds, through either express or tacit

20

agreement, on an object or course of action of the conspiracy, including depriving class members

21

of their right to protect their names, likenesses, and rights to publicity and their contractual,

22

property rights.

23

72.    Defendants have formed and operated a civil conspiracy with each other,

24

performing as a part of the conspiracy numerous overt acts in furtherance of the common design,

25

including one or more unlawful acts which were performed to accomplish a lawful or unlawful

26

goal, or one or more lawful acts which were performed to accomplish an unlawful goal.

27

28

73.     As a result of the conduct of the Defendants and the conspiracy, Plaintiff and class member have been damaged.

**FIFTH CAUSE OF ACTION**
**(Violation of the Unfair Competition Act,**
**California Business & Professions Code § 17200 et seq.)**
**(As Against Electronic Arts)**

74.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

75.     Electronic Arts's conduct and unlawful conspiracy, as alleged above, constituted and constitute unfair, unlawful, and fraudulent business practices in violation of Section 17200 *et seq.* of the California Business and Professions Code. The conduct is unfair, unlawful, and fraudulent because among other things, it violates California Civil Code § 3344.

76.     Electronic Arts's conduct has further caused and is causing damage and irreparable injury to Plaintiff and class members. Plaintiff and class members are accordingly entitled to disgorgement of Electronic Arts's profits and injunctive relief, plus interest and attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5 and request the following injunctive relief: (a) that Electronic Arts be ordered to cease and desist from continuing to unlawfully utilize Plaintiff's and class members' names and likenesses; and (b) that Electronic Arts disgorge all its profits obtained from the utilization of Plaintiff's and class members' names and likenesses.

**SIXTH CAUSE OF ACTION**
**(Breach of Contract)**
**(As Against NCAA)**

77.     Defendant NCAA entered into uniform or substantially similar contracts (which are identical in material terms) with class members.

78.     These contracts impose specified duties on Defendant NCAA and require it to fulfill certain obligations to class members, including a duty to deal fairly and in good faith with Plaintiff and class members.

| | |
|---|---|
| 1 | 79. In furtherance of the unlawful conspiracy alleged above and with the knowledge |
| 2 | and consent of the CLC and Electronic Arts, the NCAA breached its contracts with class members |
| 3 | by, among other things: (1) seeking to accomplish indirectly through its relationship and |
| 4 | agreements with Defendant Electronic Arts that which it could not do directly (profit from class |
| 5 | members' likenesses); (2) failing to insure and protect class members' rights when it established |
| 6 | |
| 7 | contractual relationships with the other Defendants; (3) permitting the other Defendants to use |
| 8 | Plaintiff's and class members' likenesses – such as when it expressly permitted Electronic Arts to |
| 9 | utilize players' names and likenesses; (4) purposely ignoring that the other Defendants were using |
| 10 | class members' likenesses, despite the fact that class members only gave Defendant NCAA |
| 11 | limited publicity rights for NCAA events; and (5) not abiding by the terms of its own contracts. |
| 12 | 80. As a proximate result of Defendants' conduct, Plaintiff and class members have |
| 13 | |
| 14 | been injured. |

<div align="center">

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(As Against Electronic Arts and CLC)**

</div>

| | |
|---|---|
| 17 | 81. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully |
| 18 | set forth herein. |
| 19 | 82. To the detriment of Plaintiff and class members, Defendants Electronic Arts and |
| 20 | CLC have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful |
| 21 | conduct alleged herein. Electronic Arts and CLC have been unjustly benefited through the sale of |
| 22 | |
| 23 | video games that utilize the names and likenesses of Plaintiff and class members. |
| 24 | 83. Between Defendants Electronic Arts/CLC and Plaintiff/class members, it would be |
| 25 | unjust for Electronic Arts and CLC to retain the benefits attained by their wrongful actions. |
| 26 | Accordingly, Plaintiff and class members seek full restitution of Electronic Arts's and CLC's |

1    enrichment, benefits, and ill-gotten gains, acquired as a result of the unlawful and/or wrongful

2    conduct alleged herein.

3                                    **PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

5

6        A.    Certification of the action as a Class Action pursuant to the Federal Rules of Civil

7    Procedure, and appointment of Plaintiff as the Class Representative and his counsel of record as

8    Class Counsel;

9        B.    A declaration by this Court that Defendants' conduct constituted a conspiracy, and

10   that they are jointly and severally liable for the conduct of or damage inflicted by any other

11   defendant;

12
     C.    Actual damages, statutory damages, punitive damages, and such other relief as
13
     provided by the statutes cited herein;
14

15       D.    Disgorgement of all profits earned by Defendants from the sale of video games

16   containing the likenesses of Plaintiff and class members;

17       E.    Prejudgment and post-judgment interest on such monetary relief;

18       F.    Equitable relief enjoining future use of the names or likenesses of Plaintiff and

19   class members in video games, and declaring null, void, and/or unenforceable any contractual
20
     provisions or NCAA rules purporting to limit the right of Plaintiff and class members to receive
21
     compensation for their injuries;
22

23       G.    Seizure and destruction of all copies of any video games in possession, custody or

24   control of Defendants or third parties (to the extent permitted by law) that infringe upon Plaintiff's

25   and class members' rights of publicity;

26       H.    The costs of bringing this suit, including reasonable attorneys' fees: and

27

28

CLASS ACTION COMPLAINT                                                                          18

1    I.    All other relief to which Plaintiff and class members may be entitled at law or in

2    equity.

3                              IX.    JURY TRIAL DEMANDED

4         84.    Plaintiff demands a trial by jury on all issues triable of right by jury.

5

6

7                                              Respectfully submitted,

8    Dated: September 4, 2009                  WEINSTEIN KITCHENOFF & ASHER LLC

9

10                                                      David H. Weinstein

11                                             David H. Weinstein (SBN 43167)
                                               Steven A. Asher
12                                             Mindee J. Reuben
                                               Jeremy S. Spiegel
13                                             WEINSTEIN KITCHENOFF & ASHER LLC
                                               1845 Walnut Street, Suite 1100
14                                             Philadelphia, Pennsylvania 19103
                                               Telephone: (215) 545-7200
15                                             Facsimile: (215) 545-6535
                                               Email: weinstein@wka-law.com

16   Joseph C. Kohn                            Roberta D. Liebenberg
     Robert J. LaRocca                         Donald L. Perelman
17   KOHN SWIFT & GRAF, P.C.                   FINE, KAPLAN AND BLACK, R.P.C.
     One South Broad Street, Suite 2100        1835 Market Street, Suite 2800
18   Philadelphia, Pennsylvania 19107          Philadelphia, Pennsylvania 19103
     Phone: (215) 238-1700                     Phone: (215) 567-6565
19   Fax: (215) 238-1968                       Fax: (215) 568-5872
     Email: jkohn@kohnswift.com                Email: rliebenberg@finekaplan.com
20
     Gerald J. Rodos                           Howard J. Sedran
21   Jeffrey B. Gittleman                      Austin B. Cohen
     BARRACK RODOS & BACINE                    LEVIN, FISHBEIN, SEDRAN & BERMAN
22   3300 Two Commerce Square                  510 Walnut Street, Suite 500
     2001 Market Street                        Philadelphia, Pennsylvania 19106
23   Philadelphia, Pennsylvania 19130          Phone: (215) 592-1500
     Phone: (215) 963-0600                     Fax: (215) 592-4663
24   Fax: (215) 963-0838                       Email: hsedran@lfsblaw.com
     Email: grodos@barrack.com
25
                                               Attorneys for Plaintiff
26

27

28

     CLASS ACTION COMPLAINT                                                          19